AO 91 (Rev. 08/09) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br>Dominic Riganotti<br><br>*Defendant(s)* | ) ) ) ) ) ) ) Case No. 17-6010-VALLE |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __9/28/16 through 1/11/17__ in the county of __Broward__ in the __Southern__ District of __Florida__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 371 | Conspiracy to unlawfully distribute Human Growth Hormone |
| 21 USC 333(e) | Unlawful distribution of Human Growth Hormone |
| 21 USC 841(a)(1) | Unlawful distribution of a controlled substance |
| 21 USC 844 | Possession of methamphetamine |

This criminal complaint is based on these facts:
See attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Sean A. Morrow, Special Agent, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __01/12/2017__

_____
*Judge's signature*

City and state: __Ft. Lauderdale, Florida__    Alicia O. Valle, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Sean Morrow (the "Affiant"), being duly sworn, do hereby depose and state the following:

1. I am a Special Agent with the United States Drug Enforcement Administration (hereinafter "DEA") assigned to the Miami Field Division Tactical Diversion Squad. As such, I am an investigative or law enforcement Officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an Officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).

2. I have been employed by DEA as a Special Agent since February 2012. I have attended the DEA Training Academy for which the curriculum lasted nineteen weeks. This curriculum included training in federal law, physical surveillance, undercover negotiations, and electronic surveillance. Prior to my employment with DEA, I was employed as a Police Officer with the West Palm Beach Police Department, West Palm Beach, Florida, for approximately four and one-half years.

3. By virtue of my position as a Special Agent, I am a federal law enforcement officer empowered to conduct investigations into the unlawful possession, possession with the intent to distribute, and unlawful distribution of controlled substances, and their associated conspiracies, and make arrests for violations of Title 21, United States Code, Sections 333, 841, and 846. I received specialized training relating to the investigation of drug trafficking and money laundering. I also have participated in numerous criminal investigations as part of my duties as a federal law enforcement officer.

4. This affidavit is being submitted to support the issuance of a criminal

1

complaint against Dominic RIGANOTTI. The Affiant submits that there is probable cause to believe that Dominic RIGANOTTI engaged in a conspiracy to unlawfully distribute Human Growth Hormone, in violation of Title 18, United States Code, Section 371, unlawful distribution of Human Growth Hormone, in violation of Title 21, United States Code, Section 333(e), unlawful distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and possession of methamphetamine in violation of Title 21, United States Code, Section 844.

5. Because this affidavit is provided for the limited purpose of establishing probable cause to support an arrest, I have not included all facts pertaining to this investigation, but rather set forth only those facts that I believe are necessary to establish probable cause. The information in this affidavit is based upon my personal knowledge as well as information I have obtained from other law enforcement agents and officers or other individuals who have personal knowledge of the facts herein.

### PROBABLE CAUSE
### The Relevant Parties

6. Dr. Dominic RIGANOTTI (hereinafter referred to as "Dr. RIGANOTTI") is an osteopathic physician who has been licensed in the State of Florida to practice medicine since at least 2002. His primary practice address is at a medical office located at 1881 NE 26th Street, Suite 60, Wilton Manors, Florida (hereinafter referred to as "the medical office").

7. Jacquelin FERNANDEZ (hereinafter referred to as "FERNANDEZ") is an assistant and phlebotomist at the medical office. FERNANDEZ is not a licensed pharmacist or individual authorized by state or federal statute to distribute statutorily scheduled substances.

2

8. Confidential Source No. 1 (hereinafter referred to as "the CS") was a documented source working with DEA. The CS has assisted several law enforcement agencies with numerous narcotics investigations since at least 2009 and has proved to be a reliable DEA source. As detailed herein, every event in which the CS was involved was corroborated by federal or state law enforcement officers and agents either through personal observations or through audio or video recordings of the CS by agents who are familiar with the functioning of the recording equipment and can attest that the recording equipment was functioning properly.

## Background of Investigation

9. Through on-going investigation, DEA learned Dr. RIGANOTTI had been prescribing an unusually large amount of testosterone and Schedule II narcotics and is possibly involved in medical fraud. In September 2016, DEA utilized the CS to make appointments with Dr. RIGANOTTI's office to investigate the full operation.

10. FERNANDEZ is an office assistant for Dr. RIGANOTTI. Through her employment with Dr. RIGANOTTI, the CS negotiated and made two purchases of Human Growth Hormone (HGH) from FERNANDEZ at her residence and one purchase at the medical office.

11. As of today's date, the CS has never provided blood test results to Dr. RIGANOTTI, or any of his staff members, and was never required to give blood for purposes of a medical examination and diagnosis.

## The CS's First Visit to Dr. RIGANOTTI's Office

12. On September 28, 2016, at approximately 10:05 a.m., the CS entered the medical office and spoke with a male office assistant at the front desk. The CS was audio

and video recorded by two separate surreptitious recording devices, one audio and one audio and video, at all times within the medical office. The CS told the male office assistant that the CS was late for an appointment. After a brief wait, the male office assistant called the CS back to the reception window. The male office assistant asked why the CS needed to see the doctor. The CS told the male office assistant he/she was there for low testosterone. The male office assistant asked the CS if he/she had taken a blood test. The CS told the male office assistant he/she had taken a blood test but did not have the results with him/her.

13. The CS was asked to wait again to allow time for the male office assistant to speak with Dr. RIGANOTTI. The male office assistant and Dr. RIGANOTTI then engaged in a conversation behind the reception window that sounded muffled on the recordings. After a couple minutes, the male office assistant called the CS back to the reception window. The male office assistant then explained that Dr. RIGANOTTI wrote a prescription for 200 milligrams of Testosterone Cypionate, a Schedule III drug, and syringes for the CS. The CS paid the male office assistant $200.00 in cash for the office visit. The male office assistant told the CS that the next visit would cost $100 and told him/her to fill the prescription at Bio Care Pharmacy.

14. During this office visit, neither Dr. RIGANOTTI nor any of his staff conducted a medical exam of the CS or obtained a medical history from him/her.

### The CS's October 18, 2016 Visit to Dr. RIGANOTTI's Office

15. On October 18, 2016, at approximately 11:30 a.m., the CS visited Dr. RIGANOTTI at the medical office. The CS was audio and video recorded by two separate surreptitious recording devices, one audio and one audio and video, at all times within the

medical office. The male office assistant greeted the CS and asked if the CS had an appointment. The CS responded that he/she did have an appointment. The male office assistant then said Dr. RIGANOTTI was running a little behind schedule. The CS replied that what the CS wanted was "simple." The male office assistant then recognized the CS and brought the CS to an exam room.

16. Once inside the exam room, the CS told the male office assistant that he/she came to the medical office previously for Testosterone 200 mg. The CS told the male office assistant that he/she wanted "Deca"—slang for the anabolic steroid Nandrolone Phenylpropionate – because he/she wanted to get bigger. The male office assistant then left the room to speak with Dr. RIGANOTTI. Upon the male office assistant's return to the exam room, the male office assistant asked the CS if Nandrolone, as written on a piece of paper, was what the CS wanted. The CS responded that Nandrolone as written was correct. The male office assistant left the room for a brief time. When he returned, the male office assistant asked the CS if he/she was going to pay for the Nandrolone. The CS replied that he/she was paying in cash and said he/she had no insurance. The male office assistant informed the CS that insurance does not pay for Nandrolone. The male office assistant then read the second script for Adderall 30 mg, a Schedule II drug, to the CS. The CS told the male office assistant that the size of the Adderall does not matter because the CS could cut them in half for use at the gym. The male office assistant then took the prescriptions to Dr. RIGANOTTI to sign. As he/she waited for the male office assistant to return, the CS engaged in friendly conversation with FERNANDEZ. During that conversation, the male office assistant returned to the exam room with the prescriptions for Adderall and Testosterone Decanoate ("Deca"), a Schedule III drug, that appeared to be

written by Dr. RIGANOTTI. The CS thanked the male office assistant and left the medical office.

17. During this office visit, neither Dr. RIGANOTTI nor any of his staff conducted a medical exam of the CS or obtained a medical history from him/her.

### The CS's November 9, 2016 Visit to Dr. RIGANOTTI's Office

18. On November 9, 2016, at approximately 12:10 p.m., the CS attended an appointment at the medical office and spoke with a female office assistant at the front desk. The CS was audio and video recorded by two separate surreptitious recording devices, one audio and one audio and video, at all times within the medical office. The female office assistant took the CS to Dr. RIGANOTTI's personal office. Dr. RIGANOTTI entered the office and asked the CS who referred him/her. The CS told Dr. RIGANOTTI that a mutual friend told him/her about the office and the great treatment they provide. The CS told Dr. RIGANOTTI that he/she obtained medical prescriptions from a male office assistant on previous visits to his office and that he/she was told by the female office assistant that the male office assistant was fired for stealing money and for allegedly writing medical prescriptions. Dr. RIGANOTTI told the CS that Dr. RIGANOTTI heard the male office assistant stole approximately $340,000.00 from his medical office and was "making deals over prescriptions" with several pharmacies.

19. Dr. RIGANOTTI then asked the CS what he/she wanted. The CS asked Dr. RIGANOTTI if he/she could get HGH Steroids (Human Growth Hormone) and possibly some other medical prescriptions. Dr. RIGANOTTI searched his computer and told the CS that he/she had received "Deca" at a prior visit. Dr. RIGANOTTI asked where the CS filled the prescription for "Deca." The CS replied that he/she filled it a

pharmacy where the fired male office assistant told him/her to go. Dr. RIGANOTTI said the CS could get the HGH from his assistant "Jacky" and called FERNANDEZ into the room. FERNANDEZ then asked the type of HGH the CS wanted. The CS responded that he/she wanted the best and asked for the price. Dr. RIGANOTTI joked that the price was $40.00, and he and FERNANDEZ laughed. FERNANDEZ told the CS she would check on the HGH and left the room.

20. A few minutes later, FERNANDEZ walked back into the office and waited for the CS's conversation with Dr. RIGANOTTI to end. At the end of the conversation, FERNANDEZ asked the CS if he/she still wanted to buy HGH. The CS responded yes. FERNANDEZ told the CS that she could have the HGH for the CS the next day or whenever he/she wanted it. Dr. RIGANOTTI again recommended that the CS buy from FERNANDEZ. FERNANDEZ told the CS the price was $1,350.00 for a month supply or, $350.00 for a week supply. FERNANDEZ told the CS that she could meet him/her at Dr. RIGANOTTI's office or at FERNANDEZ's residence. Dr. RIGANOTTI interjected and gave the CS instructions on how the CS should take the HGH. The CS obtained FERNANDEZ's phone number and told her he/she would call or send a text message to her at a later day to purchase the narcotics.

21. During the November 9, 2016 office visit, Dr. RIGANOTTI wrote the CS prescriptions for Tri-Mix Standard Compound, a non-scheduled substance, CBC Estrogen Compound, a non-scheduled substance, Oxandrolone 10 mg, a Schedule III drug, and Letrozole 2.5 mg, a non-scheduled substance. During the entire office visit, Dr. RIGANOTTI did not conduct a physical exam of the CS or obtain a medical history. Dr. RIGANOTTI only asked how the CS's blood pressure was, to which the CS

responded his/her blood pressure was good.

## The CS's November 15, 2016 Visit to Dr. RIGANOTTI's Office

22. On November 14, 2016, at approximately 5:17 p.m., the CS sent FERNANDEZ a cellular text message confirming if it was still ok to purchase the HGH from her. FERNANDEZ replied via cellular text message with a "thumbs up" symbol, signaling it was good for the CS to purchase the narcotics the next day at Dr. RIGANOTTI's office. On November 15, 2016, at approximately 11:25 am, the CS entered Dr. RIGANOTTI's medical office. The CS was audio and video recorded by two separate surreptitious recording devices at all times within the medical office. The CS checked in at the front desk and waited to be seen. Approximately four minutes after checking in, FERNANDEZ approached the CS and took the CS to another room inside the medical office. Once inside the other room, the CS attempted to pay $1350.00 to FERNANDEZ for a one-month supply of Human Growth Hormone (HGH), but FERNANDEZ said the price was $350.00. FERNANDEZ told the CS that she thought the CS only wanted a one-week supply of HGH, not a whole month's supply. FERNANDEZ stated she could meet the CS somewhere else the next day and sell the remaining supply. FERNANDEZ told the CS that she lives in Coral Springs and the CS could come to her house, or anywhere near there, to make the narcotics deal. The CS then handed $350.00 of Official Advanced Funds to FERNANDEZ in exchange for a brown paper bag containing a white box of HGH, suspected Somatropin, with the patient's information label torn from the box.

23. The CS then asked FERNANDEZ if he/she could get something for pain and if "he" (Dr. RIGANOTTI) was available. FERNANDEZ replied he (Dr.

RIGANOTTI) was there but was with "somebody." FERNANDEZ then sent a female office assistant, who was nearby, to ask for the doctor, and FERNANDEZ left the room. The female office assistant returned and told the CS that the doctor was not available. The CS then left the medical office.

24. Approximately five minutes after leaving the medical office, the CS received a telephone call from FERNANDEZ. FERNANDEZ told the CS that Dr. RIGANOTTI confused the CS for someone else and that FERNANDEZ had a prescription ready for the CS. FERNANDEZ told the CS that FERNANDEZ could bring the unknown medical prescription to the CS tomorrow or another day, but the CS told FERNANDEZ he/she would could come back to the office and get the prescription

25. Approximately eight minutes after receiving FERNANDEZ's call, the CS entered into the medical office again. Upon returning to the medical office, the CS was called back to Dr. RIGANOTTI's office and spoke with Dr. RIGANOTTI. Dr. RIGANOTTI told the CS that he had confused the CS for someone else earlier that day. The CS asked Dr. RIGANOTTI if he/she could get some some "molly[1]." Dr. RIGANOTTI said if he had known the CS was coming he would have had one of his patients bring him/her some "molly." Dr. RIGANOTTI then retrieved a bottle of Tri-mix from a refrigerator located in his office and told the CS that it was old but the CS could use it instead of "molly." Dr. RIGANOTTI gave the Tri-Mix to the CS. The CS took the bottle but told Dr. RIGANOTTI that he/she wanted the other stuff (molly). Dr. RIGANOTTI told the CS that the Tri-Mix was older so it would not work as well since Tri-Mix loses potency over time. Dr. RIGANOTTI told the CS to be careful and not to

---

[1] 'Molly' is commonly used as a slang term for Methylenedioxymethamphetamine also known as ecstasy.

9

use too much. After the conversation about Tri-Mix, Dr. RIGANOTTI wrote the CS a prescription for Percocet, a Schedule II drug. As Dr. RIGANOTTI wrote the prescription, the CS told Dr. RIGANOTTI that FERNANDEZ only gave him/her a one week supply of HGH. Dr. RIGANOTTI asked if FERNANDEZ knew, and the CS stated FERNANDEZ did know. Dr. RIGANOTTI then gave the prescription for Percocet to the CS and ended the visit. As the CS left the medical office, FERNANDEZ said she would call the CS later, and the CS told her to text him/her. After leaving the immediate area of the medical office, the CS handed the bottle of Tri-Mix to DEA agents; the bottle had another patient's personal information partially torn from it and had an expiration date that had passed.

26. During this visit, neither Dr. RIGANOTTI nor any of his staff conducted a medical exam of the CS or obtained a medical history from him/her.

**The CS's November 29, 2016 Purchase of HGH from FERNANDEZ's residence**

27. On November 28, 2016, at approximately 11:00 a.m., the CS called FERNANDEZ via cellular phone about purchasing HGH and other narcotics. During the telephone conversation, FERNANDEZ told the CS she could only meet the CS at the medical office around 12:00 p.m. At approximately 12:58 p.m. that day, the CS received a cellular text message in which FERNANDEZ wrote the CS that she had a very long weekend and was still drunk. FERNANDEZ also wrote she forgot who the CS was and apologized. The CS responded in a cellular text message asking if the CS could come over on November 29, 2016, and purchase the HGH and other narcotics from her. In a reply text message, FERNANDEZ said that would be ok and provided her address to the CS.

Later that day, FERNANDEZ called the CS and confirmed for November 29, 2016, between 2:30 and 3:00 p.m.

28. On November 29, 2016 at approximately 10:35 a.m., the CS contacted FERNANDEZ via cellular phone text message. In the text message, the CS asked if FERNANDEZ could get also get, in addition to the HGH, prescriptions for the CS to sell so the CS could leave a bottle of pain medication in the car when the CS travels. FERNANDEZ replied via cellular text message asking what the CS's full name and date of birth was and stating the cost would be an extra $100.00. That same day, at approximately 2:50 p.m., the CS called FERNANDEZ via cellular telephone and confirmed the address of FERNANDEZ's residence. This call and the subsequent sale on this date were recorded by two separate surreptitious recording devices, one audio and one audio and video. At approximately 2:53 pm, Coral Springs Detective Joe Segreto observed the CS driving in the CS's vehicle. The CS parked his/her vehicle in front of FERNANDEZ's residence. At approximately 2:56 p.m., Detective Segreto observed an unknown female, later identified as an individual under the age of eighteen years old and hereinafter referred to as "the minor," exit FERNANDEZ's residence carrying a pink bag. The minor came out of FERNANDEZ's residence with the bag without the CS reaching the door, presumably because FERNANDEZ called the minor to tell her that the CS was there. The CS explained to the minor that he/she just drove down from Orlando and spoke with FERNANDEZ on the phone. At approximately 2:57 p.m., Detective Joe Segreto observed the minor hand the CS the pink bag containing three boxes of Somatropin (HGH), syringes, and a syringe waste container. The CS then gave the minor $1,000.00 in cash for the narcotics. The CS asked the minor if she had any more HGH or narcotics in

the residence. The minor then called FERNANDEZ and asked her if is she had "any more." The minor told the CS that FERNANDEZ would have more tomorrow if the CS wanted. At approximately 2:58 p.m., Detective Joe Segreto observed the minor hand her phone to the CS. The CS spoke with FERNANDEZ, and FERNANDEZ told the CS on the cellular telephone that she did not want the minor to go into her room. The CS said FERNANDEZ did not allude to any specific narcotics that were in the residence, but the CS explained it sounded as if she was hiding possible narcotics. FERNANDEZ told the CS she would be able to get the CS a prescription the next day at the medical office. The CS then left the area with the Somatropin.

### The CS's November 30, 2016 Visit to Dr. RIGANOTTI's Office

29. On November 30, 2016, the CS retrieved the prescription offered by FERNANDEZ from Dr. RIGANOTTI'S office. Upon being seen by Dr. RIGANOTTI, the CS immediately asked for GHB.[2] Dr. RIGANOTTI responded by asking if the CS has ever tried Nuvigil. The CS responded that he/she had never heard of Nuvigil. Dr. RIGANOTTI explained how Nuvigil is similar to GHB but is more potent. Dr. RIGANOTTI then took the CS to his office in order to print an Internet coupon for Nuvigil for the CS. FERNANDEZ was in Dr. RIGANOTTI's office when the CS and Dr. RIGANOTTI entered it. Upon arriving at the computer, Dr. RIGANOTTI reiterated that Nuvigil is much more potent than GHB. While at the computer location, the CS told Dr. RIGANOTTI that he/she wanted Percocet, in addition to the GHB, but Dr. RIGANOTTI noted that the CS had received a prescription for Percocet on the prior visit. Dr. RIGANOTTI then told the CS that he could not write the same prescription within a less

---

[2] GHB is commonly known by law enforcement as the "date rape drug."

than 30-day period. Dr. RIGANOTTI then told the CS that he would give him/her a different prescription for pain and suggested Dilaudid (Hydromorphone). The CS told Dr. RIGANOTTI that he/she wanted to keep one bottle at home and one in the car. The CS then asked how anyone would know if the same prescription was written within a 30-day time period, and FERNANDEZ explained how the information was kept in a system that would not allow the same prescription to be filled within the same month. The CS asked Dr. RIGANOTTI where he/she should fill the prescription. Dr. RIGANOTTI told the CS to use his/her regular pharmacy but advised that if the pharmacy questioned the CS about the new pain prescription, then the CS should say he/she had been allergic to the previously-written Percocet prescription. Dr. RIGANOTTI then gave the CS prescriptions for Dilaudid, a Schedule II drug, and Nuvigil, a Schedule IV drug. After receiving the coupons and the prescriptions, the CS began to leave the medical office. As he/she left the office, FERNANDEZ asked the CS if he/she wanted more HGH. The CS replied that he/she would let FERNANDEZ know "next week." FERNANDEZ responded, "ok."

30. During this office visit, neither Dr. RIGANOTTI nor any of his staff conducted a medical exam of the CS or obtained a medical history from him/her.

### The CS's December 14, 2016 Purchase of HGH from FERNANDEZ's residence

31. On December 13, 2016, at approximately 6:00 p.m., the CS made a cellular phone call to FERNANDEZ in reference to purchasing HGH and other narcotics from her at her residence on December 14, 2016. On December 14, 2016, at approximately 11:00 a.m., FERNANDEZ called the CS and said to come to her residence between 2:30 p.m. and 3:00 p.m. to purchase HGH. This call was not recorded. On December 14, 2016, at approximately 2:15 p.m., the CS spoke with FERNANDEZ via cellular telephone and

13

confirmed the CS was going to FERNANDEZ's residence to purchase the HGH. This call was audio recorded by placing the cellular phone on speaker mode and using a recording device to record the conversation. FERNANDEZ told the CS she would not be home, but the minor, who sold the CS HGH on November 30, 2016, would sell the CS the HGH again for her. The CS asked FERNANDEZ why she would not be home. FERNANDEZ responded she was getting oil for her vehicle and was heading to Miami. The CS asked FERNANDEZ why she was going all the way down to Miami to have her car fixed. FERNANDEZ said she was really down there for something she should not be talking about over the cellular phone. After this conversation, the CS was recorded by two separate surreptitious recording devices, one audio and one audio and video, during all conversations with FERNANDEZ and the minor on this date. While driving to FERNANDEZ's residence, the CS called FERNANDEZ a second time and asked how many boxes was a month's supply. FERNANDEZ replied four and the price is $1,300. As the CS drove up to FERNANDEZ's residence, FERNANDEZ called and stated she charged the CS $1,350 last time but, this time it would only be $1300 and to forget about the $50. Upon arriving at FERNANDEZ's residence, the CS exited his/her vehicle, and the minor came out of the front door of FERNANDEZ's residence, presumably because FERNANDEZ called the minor. The minor was holding a large pink shopping bag containing a large number of white boxes. The minor asked if the CS wanted to buy all of the boxes. The CS explained to the minor that he/she was only purchasing four boxes. The minor asked if the CS wanted to speak with FERNANDEZ about the other boxes. The CS told the minor that he/she did not want to speak with FERNANDEZ about the large amount over the phone. The minor then asked which four the CS wanted. The CS told the minor

he/she wanted four boxes that were all the same. The minor then gave the CS four boxes of suspected Somatropin (HGH), and the CS gave the minor $1,300.00 Official Advanced Funds. The CS then left the area with the Somatropin.

32. Based on the CS's purchases of HGH from FERNANDEZ, on January 11, 2017, at approximately 7:15 A.M., federal agents and I executed a search warrant at FERNANDEZ's residence. As FERNANDEZ exited the residence at that time, DEA agents made contact with her and secured the residence for the search. During the search of FERNANDEZ's residence, DEA agents located multiple boxes containing vials of HGH. The boxes had the names of various patients affixed to them or were partially torn from the box in an effort to hide the patient's identity.

33. After the search, I read Miranda rights to FERNANDEZ per card. FERNANDEZ knowingly and voluntarily agreed to speak with me. During this conversation, FERNANDEZ admitted to selling HGH illegally, including the aforementioned sales to the CS. FERNANDEZ also told me she bought the HGH from patients she met at Dr. RIGANOTTI's office.

34. After the search of FERNANDEZ's residence, on January 11, 2017, federal agents and I approached the medical office to execute another search warrant. After securing the office, I read Miranda rights to Dr. RIGANOTTI per card in the presence of two Department of Defense Special Agents. Dr. RIGANOTTI knowingly and voluntarily agreed to speak with us. After a brief conversation, I left the area to attend to FERNANDEZ's arrest.

35. After I left, another DEA Special Agent, a DEA Diversion Investigator, and a Department of Defense Special Agent, continued to speak with Dr. RIGANOTTI.

Prior to speaking with Dr. RIGANOTTI, the Department of Defense special agent reminded him of his Miranda rights. Dr. RIGANOTTI again knowingly and voluntarily agreed to speak with the agents. During that conversation, Dr. RIGANOTTI confessed to writing numerous prescriptions for a variety of scheduled drugs with no physical exam, no blood work, and no taking of blood pressure. Dr. RIGANOTTI admitted he knew that prescribing these drugs without a physical examination was illegal. He said he did it because he needed the money. Dr. RIGANOTTI also admitted to prescribing HGH to patients who he knew were selling to FERNANDEZ. FERNANDEZ would then sell that HGH, and Dr. RIGANOTTI would get some of the proceeds. Dr. RIGANOTTI admitted he knew the redistribution of HGH was illegal. Dr. RIGANOTTI also said he had methamphetamine inside of a wall socket in his office. After obtaining this information, federal agents went to the wall socket that Dr. RIGANOTTI described and found a medium-sized plastic baggie containing approximately twenty grams of methamphetamine. DEA field-tested the substance, which tested positive for methamphetamine.

## CONCLUSION

Based on the information stated above, the affiant submits that there is probable cause to believe that Dominic RIGANOTTI engaged in a conspiracy to unlawfully distribute Human Growth Hormone, in violation of Title 18, United States Code, Section 371, unlawful distribution of Human Growth Hormone, in violation of Title 21, United States Code, Section 333(e), unlawful distribution of a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1), and possession of methamphetamine in violation of Title 21, United States Code, Section 844.

FURTHER AFFIANT SAYETH NAUGHT.

Sean A. Morrow, Special Agent
U.S. Drug Enforcement Administration

Subscribed and sworn to before me this _____ day of January, 2017.

Alicia O. Valle
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

No. _____

UNITED STATES OF AMERICA

vs.

DOMINIC RIGANOTTI,

      Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  ____Yes   _X_ No

2. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  ____Yes   _X_ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY: _____
ELIJAH A. LEVITT
ASSISTANT U.S. ATTORNEY
Florida Bar No. 725560
99 N. E. 4th Street
Miami, Florida, 33132-2111
TEL (305) 961-9036
FAX (305) 536-4086